The next argument will be in Case No. 24-1702, Subway International B.V. v. Subway Russia Franchising Company, LLC Subway International B.V. v. Subway Russia Franchising Company, LLC Just start by saying my client likes to refer to this as the case of the missing dictionary. It was interesting that in the first phase of this case, the first life of it was a motion for summary judgment by an arbitrator back in 2021. The key in that phase was the word termination, which the arbitrator decided did not really mean termination. Phase two of this case was after Judge Rakoff first looked at it, vacated, and sent it back down for an arbitration on this issue he referred to as the offer and acceptance claim. Unfortunately, in that phase, the word offer didn't mean offer. The word proposal didn't mean proposal. The word accept didn't mean accept. So we're left with a situation really where we had somebody, the arbitrator, doing everything in their power to massage the facts in order to achieve a certain result in violation of the USC. The first time around, as I said, this motion for summary judgment, in that situation, the arbitrator simply ignored the issues of fact raised on summary judgment, said it's without dispute that there was a default by Subway Russia, and therefore, we have a valid non-renewal, not a termination, because that had its own problems as the arbitrator acknowledged. A non-renewal, and therefore, I find in favor of SIBB, which is Subway International. The problem with that was, well, we never got to the issue of whether the defaults were cured. This is a 27-year business relationship where every time there was a negotiation of renewal, the parties would have a punch list of perceived defaults. They would cure those defaults. They had a certain window of opportunity. But those aren't actually cures. You didn't come into compliance with them. You just agreed to excuse them and do a renewal, right? It depended on the— I mean, you're talking about like, oh, they're not using words in a precise way, but you're just saying they're cured when, in fact, they didn't actually come into compliance with them and did not cure the defaults. They were just excused. Well, like I said— So maybe you should use the word excused as opposed to cured. There would be a punch list each time they would negotiate. Now, I think what you're referring to— They were never in compliance. They were in compliance, actually. There were two major defaults that we should focus on, which is the McDonald's Clause and the AUV Clause. The AUV Clause, because of the wars and the sanctions resulted in Russia's aggression in Ukraine, resulted in a change in the valuation of the ruble. Had you focused on the AUV in terms of rubles, they were always in compliance. In fact, they were more than in compliance. And when they finally came to terms in 2019 to change it so it would be read in terms of rubles, which was accepted— Well, that's your rubles argument, but— Yes. I thought that this was—that everybody dealt with this in terms of dollars, but I may be wrong. I'm sorry, you're— I thought that everybody during the negotiations dealt with this in terms of dollars and not rubles. I don't recall any point in which there was an argument being made to be satisfied with the requirements because rubles are being used. There was a conversation that went back to previous negotiations of new agreements where they said, you know, we get it, there's a problem with not valuing this in rubles and therefore you're not in compliance. And then they, throughout this last negotiation, said, look, we get it. You'll never be in compliance if we measure this in dollars, so that's why we agree that we will change this to rubles and here's what we think is appropriate. Do you agree? So it was not Subway Russia who said, we need to change this to rubles because it's not fair. It was Subway International that said that and Subway Russia agreed. Well, you say there were agreements, but my understanding was that there was normally a written agreement in order for there to be—in order for the—for it to carry on and that what you've done is you've taken some oral conversation and treated that as a final agreement here and yet that wasn't the practice of the parties. Well, Your Honor, let me respond to that two ways. One, the practice had always been to have independent agreements because you had to—in fact, even Judge Rakoff acknowledged this is your best argument—how could you have an opportunity to renew come July of 2019 if you hadn't cured those defaults and you can't cure it without agreements. But, you know, the arbitrator got it and she may have thought, well, past practice was to have an agreement. But, one, the agreement that it's harder for this to be conveyed because we're all sitting there. She thought you needed a 76-page MFA signed by all the parties, which is not pattern across. A little bit of cherry-picking conversations that occurred during negotiations and then further conduct that kind of evidenced the fact that there was no agreement after the language that you select—you've chosen to establish an agreement was Spanish. Your Honor, that brings me to the second point on that. If you put my glasses on, I'm a man of a certain age. The document itself that we're talking about says, and I quote, no previous course of dealing or usage in the trade not specifically set forth in this agreement shall be admissible to explain, modify, contradict this agreement. The idea that they chose in 2015 to put a two-page document together after suggesting it's not necessary but we just want to have it, that does not change the fact that they had an agreement on the same— I'm sorry, you just read the integration clause that says you can't use a course of dealing to override what's an express agreement, and you're saying we should understand that to mean that no express agreement was required? No, I'm saying that you can't say that because at one point in time, in this case 2015, they had a two-page document signed by both parties saying here's the very— But she doesn't say that. They don't say that because you did it in the past, you do it. Like there's a principle of New York law that if in the negotiation there seems to be an expectation that there's going to be a final written agreement, that you don't understand, you know, interim agreements that are not memorialized that a written agreement should be a final agreement, right? That's just the general legal principle. It doesn't really depend on the course of dealing before. I agree with you, Your Honor. The course of dealing is almost irrelevant. CONSARC decision controls here. CONSARC decision makes it very clear that unless there's specific language that says you can't have these individual agreements leading up to memorializing in one final document, those are valid. Well, they're valid if you determine that they've reached a final agreement, right? And the words we agree mean we agree. The words of your client says we agree, right? No, that Subway International said we agreed to delete the McDonald's clause. You can't get any clearer than that. It's done. They deleted the McDonald's clause. I mean, might you not, if you're negotiating toward a final agreement, say we agree to this or that term, but there are other material terms that are outstanding and so we don't have the final agreement yet. Well, Your Honor, if you could say that, it just wouldn't work here. Just as a practical matter, you know, these statements that you're talking about were in December 2019, right? They were. And, you know, since then, Subway International had been taken over by new management. The new management was much more concerned about the defaults, right? Had sent numerous notices of default, right? Sent two notices of default. They were concerned. It was explained to them. And, in fact, said something like, you know, there's been progress but there are other material terms outstanding and so we're not sure we'll reach a final agreement. But they reached like a 60-day period and then they didn't, there wasn't a resolution and they sent a notice of default, right? They sent a notice of default. Then they stayed that for 60 days. Then they sent a notice of default and said, cure it or there's a termination. They said, Subway Russia said, we've already cured that. So just intuitively, you know, a counterpart that's behaving like that, do you really think that they're adhering to an offer that was made in December 2019 that if you accept it, they'll want to have a contract? As they made it very clear, the new folks just said, we didn't know there was an agreement that cured these defaults. And, unfortunately for us, the arbitrator So you think you kind of caught them. You kind of think, like, even though they didn't want to have an agreement based on this earlier offer because somebody had sent an email and said, we agree to this or that. You think you just said, we accept, and then it binds the party that everybody agrees does not want to be so bound. That's how you think this contract was formed? I don't, Your Honor. I think that misstates how this works. The parties would go issue by issue until they come to an agreement on the issue. When they come to an agreement on each of the issues, they say, we were in agreement on all the issues. And then Subway Russia can say, now we give notice that we're going to exercise our right of renewal. That's how it works. That comes in January. Right. So here you have Subway International saying, we don't like that you're in default. I understand that you've negotiated, but there's still outstanding problems on material terms. You come along and you say, well, we agree to what Subway International said in December 2019. You said that in July 2020 or something like that, right? Yes. And you're saying, even though your counterparty was very concerned about the defaults and said there were outstanding material terms, you didn't need to hear anything else from Subway International to determine that both parties had reached agreement on all outstanding issues. That's your position? And even if that's your position, the district court said that that's not what happened, right? No. I mean, the arbitrator said that's not what happened, right? No. And that's where it gets more difficult here because the arbitrator, what the arbitrator said was, I don't care. I refuse to look at that because in the earlier motion of summary judgment, I made the following statement. It's undisputed that there was a default. When it was disputed, there was evidence put forward, and therefore, it was inappropriate to grant summary judgment. They should have gone forward with an arbitration. And even the new folks on the block that came later admitted, yeah, they did have an agreement on those two issues. We have that in our brief. They testified, yeah, there was an agreement on those issues, the McDonald's clause and the NEV clause, but we don't care. But the arbitrator also said, I'm not going to focus on that because I can't change my prior ruling that there was a default. So even if you're right, Mr. Conway, that you're confident. Why would that matter? I mean, right now, we're talking about whether there was a new contract formed, right? So even if there was a default on the earlier contract, they could have formed a new contract, right? In fact, that's one of your arguments. Well, no. What we said was that... And I understand the district court said a lot of things about the default in the course of dealing, but also says in the alternative, you know, even if there was an offer on the table from December 2019, Subway International by its conduct showed that it was not adhering to that offer. And so therefore, there wouldn't have been a contract formed in July 2020, right? Well, I disagree with the characterization, Your Honor. I think that might be what they're arguing. But the argument, but what actually happened... You disagree with the characterization of the underlying facts or that that's what the arbitrator thought? I can't comment on what the arbitrator thought. I can say what the the underlying facts are and what I can infer what the arbitrator thought. The underlying facts were that when the new management came in a couple weeks before this default happened, they said, hey, you're in violation of these two provisions. And the response was, no, we're not. Look at this. And then there was an acceptance of the remaining offer, which was for the term. And I guess there were a couple in July that were accepted, that were remaining, they were still unaccepted by Subway Russia. But there was never any... And they admit, in testimony, we never revoked the offers. We never said, oh, okay, well, we revoked that. Now that you pointed out to us that we had an agreement on the McDonald's clause to delete it, we revoked that offer to delete the McDonald's clause. There was never a revocation of the changed rules. But you're saying that you're saying that they weren't aware of it, right? That they weren't aware of it? They became aware of it. 2019 communications? They became aware of it when Subway Russia sent a letter in May of 2020. This is what happened with your predecessor. This is why there's no default. And the response was really a non-response. They just didn't... Is that not when they said, I understand that there was progress in negotiations, but we're concerned about the defaults, and there still are material terms in which there There were comments. The problem, Your Honor, was that the real fact of the matter was they were trying to get rid of all their master franchise agreements. They didn't want to do it out openly and tell them, look, we don't want a master franchise agreement. They just wanted it out. They were trying to position it for sale, which they did. They sold the company. All right, fine. So if you're saying it was clear to you that they wanted out, doesn't that mean that they would not have had the intent to form a binding contract in July 2020? Just because you want to make money doesn't mean you can violate a contract. The contract was for... I understand. So then there's a separate question as to whether they were obligated to give you a renewal. Let's put that aside for the moment because the arbitrator says that there's a breach. The second question that's the subject of the second decision by the district court is whether that you formed a new contract. If in fact you were in breach on the first one, so therefore not entitled to a renewal, they can decide not to renew for whatever reason because they have the right not to have a new agreement, right? So if you're saying it was clear to you that they didn't have the intent to have a new agreement, unless in fact they were contractually obligated to give you a new agreement, then it just means that there was no agreement formed, right? Why don't you answer this one and then after that you have reserved some time for rebuttal. Thank you, Your Honor. I guess the short answer to that is if the issue that was raised by the arbitrator and then by Judge Rakoff was, was there sufficient documentation of this new agreement? The arbitrator said, well, because you're in default of these breached provisions, I need to see a full agreement signed by the parties. But that's not what was argued because it didn't exist. What existed were these cures of the defaults and the arbitrator said that's not enough to give me a new agreement because I find their defaults, I find there's no new agreement. It was circular. Once she found before that there was a default that she couldn't go back on, despite the evidence that there was none, she couldn't find otherwise because without the, without the cure, you couldn't have the final document. Okay. Thank you, counsel. Good morning. May it please the court. I'm Mike Diablo from Venable LLP on behalf of the Appley Subway International. I'd like to comment, first of all, where we are procedurally. We're not at a closing argument. At this stage of the proceeding, it's not a matter of weighing the evidence, determining which witnesses were credible or not, who to believe or not to believe, or even much to weigh the evidence. We're here on an appeal of a district court order that confirmed arbitration awards. And as this court is aware, through a series of its opinions, it's a very exacting standard where a party seeks to vacate an award. And these principles are set out in numerous opinions of this court. That is that arbitration is meant to provide a quick and efficient means of resolving disputes. Therefore, the goal is to avoid long and expensive litigation. This case is now over four years old. And so there's a very tight and limited standard of review. In a series of decisions which we cite in our briefs, the court has held that the role of a district court in reviewing an arbitration award is narrowly limited. And arbitration decisions are generally accorded great deference under the Federal Arbitration Act. The standard is extremely deferential. An arbitrator's findings of fact and contractual interpretations are not subject to are insufficient. Disagreement, as we've just heard, these are all arguments, all the arguments we've just now heard, as well as most of the briefs, are disagreements with the arbitrator's interpretation of the evidence. And the standard is that is not grounds for vacature under the Federal Arbitration Act. A federal court may not vacate an arbitration award merely because it is convinced that the arbitrator made the wrong call on the law. So what's the question today is? The question today, or on appeal, is did Judge Rakoff apply these standards? And he did. And so what's the standard of review here now before the Second Circuit? Although technically, you have de novo review of the legal questions prevented, that review is focused on whether the district court applied the very deferential review standard in accordance with accorded to arbitration awards. And there's no question that Judge Rakoff did. Their briefs are replete with factual arguments and disagreement over the credibility of the witnesses and evidence. And so I guess what I'll do now is just focus on some of the questions. Well, if the opposing counsel were right, that actually the district court vacated the first award completely, and so then the arbitrator on remand was supposed to reconsider all those issues, and then didn't perceive the his or her authority, you know, that would be an argument that something has gone awry, right? That would be an argument? I'm sorry, I didn't hear the last part. That something has gone awry, that like maybe there was a separation of legal standards. Well, so first of all, I think Judge Rakoff has made clear that he vacated the first award solely for determination on the offer acceptance claim, right? That was its sole purpose. And so he quite clearly states that I didn't send it back for reconsideration of everything. And so we cited in our papers this legal doctrine called functus officio, which holds that where an arbitrator has finally resolved certain issues, he or she, the arbitrator, is no longer empowered to do so. The reason being there is a public concern that people of some influence might persuade an arbitrator that's finally decided an issue to come back and revisit it, and that's the purpose of the doctrine. And so there's no question that the arbitrator, Arbitrator Riley, finally resolved the issues of whether there was a right to renew, and she determined that there was no right to renew because of the existence of the defaults. But as you said in some of the comments and questions you asked to Mr. Conway, isn't it also possible, aside from the right to a new question, couldn't the parties always just say, you know what? We'll ignore the defaults. We'll ignore our disagreements on those issues. Let's agree to a new agreement. And that's really what the second proceeding was. And the decision of the arbitrator was there was no, let's say, meeting of the minds, no agreement to a final, integrated clause. So the parties had always entered final agreements. The arbitrator, and Judge Rapoff notes this in his opinion, went through a very careful analysis under New York law. What does it mean? What are the factors that ought to be considered as to whether the parties reached a final agreement? And some of those factors were what did they intend? Intent is something to be determined from the evidence, and she determined from the evidence that the intent was always to have a final integrated agreement. In fact, that was the long history of practice between the parties over their relationship. Second, what's the nature of the business relationship? This is a large development deal involving all of Russia for subway, its trademarks, its system of business. And so that kind of international transaction invites or usually requires fully integrated agreements. And she went through those and other factors. But one of the things that Judge Rapoff notes in his opinion is that they didn't dispute some of the alternate findings that the arbitrator made in finding that the parties didn't come to a final agreement on a new master franchise agreement. And so, and we cite in our papers decisions that hold where a party doesn't challenge those findings. They've waived the right to challenge them. So the findings you're talking about is the finding that Subway International had repudiated, even if there were an outstanding offer, they had repudiated it. Through the, they revoked it through the conduct, right? And so they didn't challenge that. The other one was that the arbitrator found one of the key components we called it, or they called it, the McDonald's clause, right? The actual clause said that you, our development agent, will be in breach unless you meet a development schedule that assures that we have the most units of any fast food franchise system in Russia, or at least equal in numbers. So that's what they call the McDonald's clause. And so one of the terms that went back and forth on was, if we enter a new agreement, what's that development schedule going to be? And if we agree to the new, if we fail to meet that new development schedule, will we as the developer, they as the developer really, will the developer be in default in a termination? There was back and forth on that issue. And what the arbitrator found was, well, the parties in discussing the possibility of a new agreement had agreed to a schedule of about two or three years on what had historically been, I think the relationship had been 27 years to that point. There was no agreements to beyond year three. So the arbitrator determined the terms were too uncertain to come to an agreement. And again, as I said, that was the other issue that they didn't challenge or raise below and it's therefore deemed way. So let me put it this way. I think that the district court applied the very deferential standard that was required of him in affording deference to the arbitrator, to her findings. This court's role, as I said at the beginning, was determining whether the district court did so. The arguments we've heard today, the arguments in their papers are more akin to what we'd hear at a closing argument. One of the arguments Mr. Conway was making that actually, so you're saying that there wasn't a final agreement because you didn't agree on the developmental schedule and that wasn't definite enough. But could it be that you agreed to cure, as he says, the defaults because you agreed to and that would suggest that maybe they had a right to renew? No, the arbitrator addressed that issue also and Judge Rakoff played deference to that. And that, their argument was that piecemeal along the way, new terms were agreed to that resulted in some cures of the outstanding defaults. The arbitrator- Are they cures of the defaults? They were not cures of the defaults. They were in preparation for a future agreement, right? They weren't saying that you hadn't reached the earlier agreement. These were all back and forth in negotiations over a future agreement. In fact, the starting email that created or initiated those discussions said that, said in the text of the email, that none of this is binding until approved by senior management, even these terms. We had the testimony from Mike Kehoe, who was president of York, Middle East and Africa region, who testified, look, when we negotiate, we often agree, you know, momentarily to certain terms, but then if the counterparty comes back to us and they want something else, then we might have them give back something that we had agreed to, but there's nothing final, no final and deal until we have a full and final signed agreement. Ms. Riley, the arbitrator, accepted that testimony is within her rights in rejecting the claims. Thank you, counsel. All right. Thank you. I appreciate the time. We'll hear about them. So with respect to, I guess, one of the first statements by Mr. Jablow, this is not a disagreement with respect to evidence. It's a disagreement with respect to the way this was handled. Like I say, the first instance, Judge Rakoff refused to even review any of the various failings that were in the motion to vacate the first time around. Second time around, apparently those were all put aside for a moment, but he still didn't review them. He still to this day has not reviewed any of those grounds except for the one that we pointed out, that the offer acceptance claim had not been even addressed. That's what he sent it back down for. He didn't address any of the other issues, still has. That's an error. That's a reversible error. Right now, though, I want to say, with respect to the discussion you just had, had we viewed this as you just pointed out, as, okay, you agreed to a revision of the development schedule, revision of the rubles, can you have an agreement? Yes, you can have an agreement. Because the master franchise agreement says all terms and conditions other than those changed are going forward. So you have a master franchise agreement. How do we get to review this? Essentially, you get to that because the arbitrator completely refused, one, to consider the evidence because of a previous failing, which the parties both agreed, we want you to arbitrate the issue of whether there was a termination here. The arbitrator said, no, I'm going to do it my way. I'm not going to reach that issue. Went back and then the arbitrator decided. No, the arbitrator never decided whether there was a valid termination. The second time around, it was a separate issue of offer acceptance. Would not go back. Said, I will not go back. This idea of functus officio, we point out in our papers, doesn't exist here. It's a non-issue. And the fact is that... I don't quite understand. Maybe I'm missing something here. The first decision by the arbitrator that Judge Raicoff reviewed had the original default questions. Was decided, was it not, by the arbitrator? The arbitrator in that case said, I find that there's no dispute that there was a default. But there was. This is a motion for summary judgment. Remember, they didn't have testimony. And they put in evidence that there was dispute. The job of the arbitrator was then to say, motion for summary judgment denied. Let's have an arbitration. We point that out to Judge Raicoff. He ignored it. He simply didn't look at it. He put it off to the side. If we take it for at face value that he didn't mean what he said when he said vacate, he put it to the side. If he just said, I'm adherent to the first decision, I think it should be affirmed. But we ought to hear from the arbitrator on the second. Because this case is going to go to appeal someday. Who knows? I mean, I don't, I really am difficult. I mean, you've made a bunch of arguments as to why the vacater that Judge Raicoff entered was a vacater of the whole thing. And then he didn't really get, it didn't go back. I don't, my understanding is there was issue one and there was issue two, and both issues were arbitrary. And both issues were ruled upon by Judge Raicoff. There was, in the first case, there was no arbitration. It was motion for summary judgment. There was issue one, two, and three. Issue one. I'm not worried about three because I don't think that's. Well, the force majeure is issue three. It never, never addressed at any time. Issue one was we shouldn't have gotten, we shouldn't have gotten to the issue deciding we should have gone for the issue finding under motion for summary judgment. Issue two was the offer and acceptance claim. Judge Raicoff said vacated. Now we're going to assume for the purposes of this argument that he meant partially vacated to hear that offer acceptance claim. I'll get to issues one and three next time around. He never did. We still, to this day, haven't gotten any decision. At the very least, you have to send this back to him for that decision because he's not ruled on those issues one and three. Okay, I think we have your argument. Issues one and three, so you're saying it's about whether the defaults were cured and then the force majeure argument? The force majeure argument was never addressed below and it was never addressed by Judge Raicoff. On the defaults, you know, maybe it's fair that he doesn't have a section of the opinion that says like here's what I think about the defaults, but it's pretty clear he thinks that the factual findings that subway rush wasn't default are well supported and that there wasn't partiality and there's no reason for vacating it, right? This is why it's complicated. If you read Judge Raicoff's opinion, I mean it's pretty clear what he would say about, or I mean he does say about the default argument. Like there's no dispute that they were in default and so there wasn't a right to renewal and so then it really is, you know, more of a question as to whether there was a new agreement. Minds can differ on whether they're in default. We're not suggesting that that issue was decided in the first instance based on... I mean if minds can differ about whether they were in defaults, then you're supposed to uphold the arbitration award, right? No, because the arbitration award in the first instance wasn't after arbitration. It was a summary judgment where you're supposed to hold issues that are contested for arbitration and this was a contested issue. That's my point. We can differ on whether or not there was a default, but we can't differ on the fact that Judge Raicoff should have said, you got to have an arbitration on whether there's a default. We never got that. Judge Raicoff pretty clearly says, I don't think there's any serious dispute as to whether they were in default. They seem to be negotiating over whether to excuse the defaults, but that wasn't memorialized. It doesn't amount to a cure, as you're saying. So he just disagrees with you on that, right? And you're talking about the second decision. Had we gotten to the first decision, what we asked him for, which was a ruling on whether she overstepped her bounds, we could have had an arbitration on all the issues. We could have gotten evidence out on all the issues. We could have had a full and fair record. We didn't get that because he refused to look at the issue that was raised. Did she overstep her bounds? Did she go beyond what she was supposed to? Okay. Thank you, counsel. I think we have your arguments. Thank you both. Thank you.